CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
APR 2 5 2005
JOHN F. CORCORAN, CLERK
BY: /s/ Paul Coleman
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

|  |  |
|---|---|
| ALISON LITCHFORD; SUE MORGAN; JANE HAMLETT; AND SUSAN HUDGINS,<br><br>*Plaintiffs,*<br><br>v.<br><br>DANNY WILLIAMS,<br><br>*Defendant.* | CIVIL ACTION NO. 6:04-CV-00006<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

The above-captioned matter is before this Court on a motion by Defendant Danny Williams for Summary Judgment. Plaintiffs claim that they were wrongfully terminated from their positions at the Buckingham County Sheriff's Department on the basis of their constitutionally protected political speech. The Court exercises federal question jurisdiction over this matter, pursued under 42 U.S.C. § 1983. For the reasons that follow, the Court denies Defendant's motion. The Court does, however, find that Defendant is entitled to qualified immunity, insulating him from liability in his personal capacity.

I.

This case arises from circumstances surrounding the election of Defendant Danny

1

Williams as Sheriff of Buckingham County, Virginia. In the fall of 2003, Buckingham County held a hotly-contested race for county sheriff between the incumbent Garnett Shumaker and Williams, the challenger. At the time, Plaintiffs held various positions in the Sheriff's Department: Alison Litchford was an administrative assistant, Sue Morgan had served as the Communications or Dispatcher Supervisor, and Susan Hudgins and Jane Hamlett were both dispatchers. During the campaign, Shumaker enjoyed broad support among most of his employees. Plaintiffs were particularly supportive, however, and Shumaker felt that they were among his most vocal backers. On October 31, 2003, twenty-four of Shumaker's employees, including Plaintiffs, signed a letter to the editor of the *Farmville Herald* endorsing his reelection campaign. In part, the letter read as follows:

> Any office can work efficiently if the person in charge is a leader and takes the initiative to better the daily operations and puts the office and staff before his own benefit . . . .
> . . . . Employees of this office stand behind Sheriff Shumaker's values and we eagerly anticipate his continued leadership.

Beyond the letter to the editor, most of Shumaker's employees, including Plaintiffs, placed campaign signs in their yards and worked the polls on election day, encouraging citizens to vote for Shumaker. Despite these efforts, Williams defeated Shumaker on November 3, 2003.

Pursuant to Virginia statute, upon the expiration of a county sheriff's term, the terms of all of his or her employees also expires. *See generally* Va. Code § 15.2-1603; *Ramey v. Harber* 431 F. Supp. 657, 663 (W.D. Va. 1977). After winning the election, Williams posted a notice advising that we would hold an individual interview with any current Sheriff's Department employee desiring reappointment. Of the twenty-four department employees who had actively

supported Shumaker's campaign, eighteen, including Plaintiffs, sought reappointment by signing up for a meeting. All meetings were conducted on November 26, 2003. It is not disputed that when meeting with each of Plaintiffs, Williams made various comments regarding their activities in supporting Shumaker's campaign, including comments concerning their decision to work at the polls, place yard signs, and sign the letter to the editor. Williams also expressed his belief that Plaintiffs had made derogatory personal attacks against him, to the effect that he had lied, had cheated on his wife, and had beat her. There is some dispute as to Williams's exact language and his demeanor when discussing these issues.

After holding the meetings, Williams decided to rehire thirteen of the eighteen employees that had sought reappointment, but he did not rehire any of Plaintiffs. Subsequent to Williams' decision, Plaintiffs filed this suit, claiming that Williams had decided not to rehire them in retaliation for their political speech against him in the campaign. Williams argues that his decision was based on, among other issues, his professional concerns regarding Plaintiffs and his belief that they had made derogatory personal attacks against him. Williams now moves for summary judgment.

II.

Summary judgment should only be granted if, viewing the record as a whole in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 (4th Cir. 1985). In considering a motion for summary judgment, "the

3

court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted). Where the movant has made out a *prima facie* case that would entitle it to summary judgment, the non-moving party bears the burden of presenting evidence showing that there is a genuine issue of material fact. The party must demonstrate specific facts, as opposed to general allegations, that present an issue worthy of trial. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 556–57 & n.3 (1992).

### III.

A government officer performing a discretionary function is entitled to qualified immunity, protecting him from civil damages liability in his individual capacity, if his actions were objectively reasonable under the circumstances confronting him at the time of the discretionary function. *See Anderson v. Creighton*, 483 U.S. 635 (1987). In determining whether a defendant is immune from suit under qualified immunity, courts follow a two step process. First, they determine whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the official violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pike v. Osborne*, 301 F.3d. 182, 184 (4th Cir. 2002) (concluding that plaintiff's evidence of causation, while "thin and circumstantial," should be assumed to be sufficient). If the facts demonstrate that no constitutional right could have been violated, then the inquiry ends and summary judgment is proper on all claims. If, however, the facts could support a finding of a constitutional violation, a second step of analysis is necessary. Notwithstanding the potential violation, qualified immunity protects an official from a suit in his individual

4

(though not official) capacity unless the right at issue was clearly established at the time he acted, such that "a reasonable official would understand that what he was doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. at 640.

Plaintiffs have sued Williams in both his official capacity for injunctive relief and in his personal capacity for damages. Williams argues that summary judgment is appropriate for all claims because Plaintiffs simply cannot establish that his refusal to hire them under the circumstances was a violation of any constitutional right. In the alternative, he argues that he is at least entitled to qualified immunity from suit in his personal capacity because such right was not clearly established at the time that he acted. In accordance with the two-step analysis contemplated by *Saucier*, the Court considers these two arguments in turn.

A.

Williams' first claim is that Plaintiffs cannot establish that he violated a constitutional right, which would entitle him to summary judgment for all claims against him in both his official and personal capacity. Specifically, Williams argues that Plaintiffs cannot demonstrate that he discharged them in retaliation for exercising speech protected by the First Amendment.

The First Amendment protects employees from termination in retaliation from their employment for exercising speech relating to matters of public concern. It does not, however, protect speech regarding "personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest." *Stroman v. Collection County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992). Furthermore, the First Amendment's protection of speech regarding matters of public concern is not absolute. It "must be tempered by the government's

5

interest in governmental effectiveness, efficiency, order, and the avoidance of disruption. As an employer, the government is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies." *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998) (citing *Connick*, 461 U.S. 142, 147). Due to these competing interests, when determining whether an employee has a First Amendment retaliatory discharge claim, a court must balance "the interests of the [public employee], as a citizen, in commenting upon mattes of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). Thus, in analyzing a First Amendment claim for retaliatory discharge as described in *Pickering*, this Court must determine: (1) whether the employee was speaking as a citizen on a matter of public concern or rather as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the termination decision. *McVey v. Stacy*, 157 F.3d at 277–78.

In balancing the employee's interest in speaking on matters of public concern with the employer's interest in an effective and efficient workplace, we must consider the nature of the employee's position, the context of the employee's speech, and the extent to which it disrupts the agency's activity. *McVey*, 157 F.3d at 278. Factors to be considered include whether the speech:

> (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental impact on close working relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the "responsibilities of the employee within the agency"; and (9) makes

6

use of the "authority and public accountability the employee's role entails."

*McVey*, 157 F.3d at 278 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388–91 (1987)). Accordingly, public employees are entitled to less First Amendment protection if their speech can undermine or interfere with the government agency, its mission, and the public confidence. *McVey*, 157 F.3d at 278; *Bates v. Hunt*, 3 F.3d 374, 378 (11th Cir. 1993). Further, courts have held that an employee is generally exempt from free speech protection "[i]f the position resembles a policymaker, communicator, or a privy to confidential information." *Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1987); *accord Stott v. Haworth*, 916 F.2d 134 (4th Cir 1990). In determining whether an employee's position is subject to one of these First Amendment exemptions, courts focus on the powers inherent to their particular position, as opposed to the function performed by the particular occupant of that office. *Stott*, 916 F.2d at 142; *Harter v. Vernon*, 980 F. Supp. 162 (M.D.N.C. 1997) (finding that a deputy sheriff qualified as a policymaker even though he was not firearm certified, did not go on patrol, and only worked in the communications center). The government has the burden of demonstrating that the powers inherent in the position are sufficiently elevated that they exempt that position from free speech protection. *Cf. Buckley v. Valeo*, 424 U.S. 1, 94 (1976) (finding that a significant impairment of First Amendment rights must survive exacting scrutiny, where the burden is on the government to show the presence of a paramount interest).

Guided by these standards, we now turn to the question of whether Plaintiffs can make out a *prima facie* case of retaliatory termination for the exercising of free speech rights. Williams argues that Plaintiffs cannot meet their burden of establishing either: (1) that Plaintiffs'

7

speech was the cause of their termination or (2) that their speech interest outweighed his interest in running an efficient office. The Court considers each of these arguments in turn.

1.

Williams first contends that Plaintiffs have not offered sufficient evidence to prove causation and that, even if they have, Plaintiffs cannot rebut his valid reasons for terminating them. The Court disagrees on both counts. In *Wagner v. Wheeler*, 13 F.3d 86 (4th Cir. 1993), this Circuit acknowledged the prevailing standard for the burden of proof for causation in these cases:

> The Supreme Court has allocated the burden of proof regarding causation between the parties in a first amendment discharge case in the following manner. The initial burden lies with the plaintiff, who must show that his protected expression was a substantial or motivating factor in the employer's decision to terminate him. If the plaintiff successfully makes that showing, the defendant may still avoid liability if he can show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination.

*Id.* at 90 (internal quotations and citations omitted) (citing *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 416–17 (1979)).

Regarding the issue of causation, Plaintiffs have marshaled a wide array of evidence. First, Plaintiffs have provided evidence from former Sheriff Shumaker that they were "the most active and vocal supporters" of his reelection campaign, and they have noted the close temporal proximity of the campaign and Williams' decision not to rehire them. Second, Plaintiffs' own depositions assert that Williams made clear in his individual meetings with the Plaintiffs that

8

their vocal support of Shumaker was the basis for their termination. Specifically, they allege that Williams stated that they had "all crossed the line with this loyalty thing to Garnett," that Plaintiffs "didn't have to work the polls, put signs in your yard, and you didn't have to put the [letter to the editor] in the paper," and that he was not willing to rehire another employee "after she signed her name to the [letter to the editor] that all of you signed." Although Williams disputes the claim that he made those statements and argues that Plaintiffs' self-serving deposition evidence of causation is mere "conjecture" insufficient to survive summary judgment, the Court disagrees. Even taken by themselves, Plaintiffs depositions are sufficiently specific as to constitute an issue of material fact regarding causation. *See Pike v. Osborne*, 301 F.3d. 182, 184 (4th Cir. 2002) (concluding that plaintiff's evidence of causation, while "thin and circumstantial," should be assumed to be sufficient). But there is further evidence that Plaintiffs' political activity motivated Williams. Plaintiffs also assert in their depositions that Williams asked specific questions in the meeting regarding their letter to the editor, their working at the polls, and political yard signs. He had recently attended a new sheriff's seminar on "lawful employment" that would have given him the tools to create a pretexual basis for the firing, and he made the curious decision to only keep detailed notes for the few reappointment interviews where applicants were not rehired. Most significantly of all, Williams made the remarkable admission in deposition that his determination of whether to rehire an employee "would depend upon how hard he campaigned against me." (Williams Deposition at 82.) Williams suggests that this statement referred to the derogatory personal rumors that he believed some of Plaintiffs had spread about him during the campaign. Again, however, this is a disputed issue of fact ripe for consideration by a jury, not by a court on summary judgment. Further, even if Williams' claim is

9

true, Plaintiffs may be able to demonstrate that the personal rumors regarding Williams qualify as protected speech because they relate to a matter of "public concern" that outweighs the government's interest in "promoting the efficient public service through its employees."[1] *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (internal quotes omitted) (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968))). In this sense, taken either as a comment regarding Plaintiffs' campaigning or one regarding Plaintiffs' rumors, Williams' deposition admission is also potentially significant evidence regarding causation. It, taken together with the evidence Plaintiffs have presented, is certainly sufficient to allow a favorable finding as to causation.

---

[1] In this sense, it may not matter whether Williams terminated Plaintiffs on the basis of their overtly political work or their derogatory personal comments about him. To be sure, if Williams could establish that his decision was based on the derogatory comments, certain case law suggests that the relevant speech in this case would not qualify as protected. *See Hopkins v. Dollinger*, 452 F.Supp. 59, 61 (1978) (holding that deputies' expressions of opinion that a sheriff was guilty of stealing and perjury are not protected under the First Amendment). In *Hopkins*, the court explained that the Supreme Court in *Arnett v. Kennedy*, 416 U.S. 134, 161 (1974), had already rejected First Amendment protections for employee character attacks against government employers by citing with approval a proposition in *Meehan v. Macy*, 392 F.2d 822, 835 (App. D.C. 1968) (en banc), to that affect. *Meehan* had stated that "it is inherent in the employment relationship as a matter of common sense if not common law that an employee cannot . . . reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [remarks]." Accordingly, the law in this district suggests that Plaintiffs' spreading of derogatory personal rumors regarding Williams would not be subject to First Amendment protection. Nevertheless, the present circumstances possibly should be distinguished from those of *Hopkins* on two grounds. First, the case concerned the speech of two patrolling deputies—positions that are generally afforded less First Amendment protection than those of administrative and support staff. *See Jurgensen v. Fairfax County*, 745 F.2d 868, 880 (4th Cir. 1984). *Hopkins* made a point of noting that "[a] deputy in uniform and driving throughout the county in an official car carries with him public trust." *Hopkins*, 453 F. Supp. at 62. By contrast, none of Plaintiffs' positions had the same level of public visibility or stature. Second, in the present case, Plaintiffs' statements do not simply disparage their superior; they also concern his character as a candidate during an election campaign, when such assessments are often valuable in making an informed voting decision. In contrast, the deputies in *Hopkins* made accusatory comments about the sheriff to other private citizens while the sheriff was subject to an investigation. In this sense, Plaintiffs' derogatory comments regarding Williams may be distinguished from those in *Hopkins*, such that they also qualify for First Amendment protection. Notably, the *Hopkins* court explicitly chose to avoid the question of whether a deputy's reporting of his suspicions to an appropriate law enforcement officer would be protected under the First Amendment. *Id.* at 61 n.1. In the same sense, Plaintiffs' decision in this case to pass on character assessments to those people responsible for evaluating the sheriff—namely, citizen voters—also may fall outside the ruling in *Hopkins*. Before determining whether, in the present case, the alleged derogatory remarks qualify as a valid basis for termination, further evidence regarding the nature and circumstances of the comments is necessary.

Case 6:04-cv-00006-NKM    Document 83    Filed 04/25/05    Page 10 of 18    Pageid#: 893

This evidence provided by Plaintiffs is not merely sufficient to satisfy their *prima facie* burden as to causation, however; it is also sufficient to serve as a rebuttal to the justifications Williams has offered for terminating Plaintiffs, by suggesting that they are pretextual. Williams points to various concerns he had regarding Plaintiffs, claiming that: (1) Litchford had made derogatory statements about him during the campaign, she had difficulty maintaining confidences, she was associated with a drug user, and she was Shumaker's niece; (2) Morgan also had made derogatory statements about him and displayed a poor attitude in her reappointment interview; (3) Hudgins also had made derogatory statements, she had made excessive phone calls at work, and she did not interact well on the dispatch radio; and (4) Hamlett had a poor attitude on the dispatch radio, she had acknowledged conflict with another employee, and she did not appear willing to work with him. Williams also contends that he asked questions about the campaign at all of his individual reappointment meetings, yet chose to rehire thirteen of the eighteen employees seeking reappointment who had opposed him—strong evidence that political affiliation could not have motivated his hiring decisions. It is true that "[i]n mixed motive cases, a lack of widespread patronage dismissals weighs heavily against any inference of a politically motivated discharge," *Phipps v. Wright*, 765 F. Supp. at 1547. Nevertheless, Williams cannot point to any case holding that evidence of a lack of widespread patronage dismissals will resolve the issue of causation, requiring summary judgment as a matter of law. There is good reason for this fact. The law is reluctant to make a per *se rule* regarding evidence of a lack of widespread dismissals precisely because there are circumstances, such as the present case, where a plaintiff's evidence nevertheless casts serious doubt regarding the defendant's proffered justification. Here, Plaintiffs' evidence raises substantial questions about

11

Williams' motivation for firing them. In light of this evidence, the mere fact that Williams did not terminate every employee who had opposed him does not prove that he did not terminate the Plaintiffs on this basis. As any savvy government official knows, it would have been impossible for Williams to baldly fire every department employee for opposing him without immediately raising First Amendment alarm bells. Accordingly, it is certainly possible that Williams chose to focus his retribution on the employees who had opposed him most vociferously.

2.

Next, Williams argues that even if Plaintiffs have provided sufficient evidence to rebut his justifications for not rehiring Plaintiffs, they cannot demonstrate that their interest in speaking on matters of public concern outweighs Williams' interest in an effective and efficient workplace. At the outset, Williams argues that because he has expressly denied that he was motivated by Plaintiffs' campaigning efforts, the Court should only consider Plaintiffs's derogatory comments regarding him when balancing the interests. This argument fundamentally misconstrues the evidentiary record. In fact, Plaintiffs have provided substantial evidence that Williams was specifically motivated by political interests as discussed above. For this reason, the Court must consider not merely Plaintiffs' allegedly derogatory remarks, but also their campaign efforts, when determining the extent of constitutional protection to which Plaintiffs are entitled. On this point, the law is clear that "[t]he political speech that the deputies charge caused their [harm] must be given the highest constitutional protection." *Pierson v. Gondles*, 693 F. Supp. 408, 412 (E.D. Va. 1988). Plaintiffs' campaign efforts therefore qualify as speech on a matter of public concern entitled to great weight in the balancing process.

12

More significantly, Williams also suggests that under the standard laid out in *Stott v. Haworth*, discussed *supra*, Plaintiffs are not the kind of employees that are entitled to extensive First Amendment protection in the first place, thereby eliminating any free speech interest they could have for purposes of interest-balancing. Specifically, Williams argues that: (1) Morgan was the Dispatch Supervisor, making her a "policymaker" for dispatchers; (2) Morgan, Hudgins, and Hamlett were all dispatchers privy to "confidential" information regarding officer locations, patrols, and stakeouts; (3) Hudgins and Hamlett "communicated" with the public via their roles as dispatchers; and (4) Litchford, while essentially a secretary, was nonetheless a sworn deputy, making her a "policymaker" under *Scott*. These arguments fail on two grounds.

First, the mere invocation of talismanic words regarding an employee's position is not sufficient to establish that it falls within the exception to free speech protection. As the court made clear in *Branti v. Finkel*, 445 U.S. 507, 518 (1980), "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Here, despite his bare assertions regarding the positions, Williams has not provided sufficient evidence to indicate that Plaintiffs should qualify as the "confidential," "policymaking," or "communicating" employees that are exempted from free speech protection. *See Pierson*, 693 F. Supp. at 412 ("[T]he Sheriff has failed to present evidence that [plaintiffs] are highly placed or that their positions are so highly visible that mutual trust and confidence is important."). Specifically, Williams has not explained how Morgan's role as Dispatch Supervisor gives her a specific policymaking power, other than perhaps instructing fellow dispatchers as to appropriate dispatch terminology. Similarly, he has

13

not explained how the other dispatchers' access to "confidential" information—much of which is publicly available on a police band—is sufficiently significant to qualify them as confidential privies within the meaning of *Jenkins* and *Branti*. Common experience tells us that nearly any employee who works in an office where confidential information is present has some access to such information; the mere fact that workers can access such information does not render them sufficiently "highly placed" or "highly visible" so as to diminish their protection. *Id.* Second, despite the holding of *Harter v. Vernon*, 980 F. Supp. 162 (M.D.N.C. 1997), Williams has not provided sufficient evidence to establish that Litchford, as a sworn deputy, was a policymaker. To be sure, *Harter* did hold that a sheriff's deputy assigned to ministerial tasks nonetheless qualified as a policymaker. *Harter*, 980 F.Supp. at 164. Yet the Court premised this finding on the nature of deputy position to which the employee was sworn, explicitly noting that "at the time of his termination, [the plaintiff's] position as a deputy required him to engage in law enforcement activities as a road deputy." *Id.* Here, in contrast to *Harter*, Williams has offered no evidence to establish that Litchford's secretarial sworn deputy position had similar policymaking characteristics. Because it is not clear that policymaking power was inherent in Litchford's deputy position, *Harter* does not apply and this Court cannot assume that she is a policymaker exempt from free speech protection.

Because Plaintiffs were entitled to broad speech protection based on their positions and the alleged speech in this action was constitutionally protected, the Court finds that the speech rights at issue outweigh Williams' interest in the efficiency of his department. Accordingly, the action survives this hurdle as well.

14

In short, the Court rules that this case is appropriate for trial. To be sure, this Court is sensitive to the difficulties that face an incoming sheriff who is faced with building a team of positive and committed employees upon whom he can rely. It is also aware of the troublesome incentive for governmental employees to use the pretext of free speech rights to effectively entrench themselves in positions not merited by their actual job performance. Nevertheless, based on the evidence presented, a reasonable jury could conclude that Williams, intent on firing the Plaintiffs for their vigorous campaigning against him, conceived of a plan to interview the Plaintiffs with no intention of hiring them, conjure a list of their professional failings, and then fire them based on that pretextual basis.

B.

Because the Plaintiffs have provided sufficient evidence to avoid summary judgment regarding a constitutional violation, we now turn to consider whether the right allegedly violated was clearly established at the time. A finding in the negative would prevent suit against Williams in his individual, though not his official, capacity. As discussed above, the evidence, viewed in a light most favorable to Plaintiffs, supports a finding that for political reasons Williams terminated Plaintiffs from their individual positions as administrative assistants, dispatchers, and head dispatchers. As this Court has found that Plaintiffs' specific positions would be entitled to First Amendment protection, the question therefore becomes whether it was clearly established that Williams' alleged actions violated the law.

Williams argues that as of November 2003, the law was not clearly established, citing *Pike v. Osborne*, 301 F.3d 182 (4th Cir. 2002). In holding that a sheriff was entitled to immunity

15

for the alleged firing of two dispatchers, *Pike* noted that in these cases "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, yet difficult to apply, and not yet that well defined." *Pike*, 301 F.3d at 186 (citing *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) (internal quotations omitted)). Williams also cites to the concurring opinion in *Pike*, which argued that a recent decision on the issue, *Jenkins v. Medford*, 199 F.3d 1156 (4th Cir. 1997), was "confusing, at best, on the point of whether sheriffs in Virginia can lawfully terminate for political reasons dispatchers with privity to confidential information." *Pike*, 301 F.3d at 186 (Hamilton, S.J., concurring). While dispatchers are usually considered to be clerical workers entitled to free speech protection, *Jenkins* had noted that "[i]f the position resembles a policy maker, a communicator, or a privy to confidential information, then loyalty to the sheriff is an appropriate requirement of the job." 119 F.3d 1163, 1164 (4th Cir. 1997). On this basis, the concurring opinion in *Jenkins* found that it was not yet clearly established whether the position of dispatcher qualified as a "confidential" position to be exempted from First Amendment protection. This basis must be distinguished from the reasoning of the plurality opinion, which held that given the "difficult-to-apply" balancing test between an employee's interest on commenting on matters of public concern and the employer's interest in an efficient workplace, it was not clearly established that Plaintiffs' interest in commenting on a matter of public concern outweighed Williams' interest in maintaining a loyal and efficient sheriff's department.

The Court finds that the plurality opinion from *Pike* controls on this matter. A decision as to whether Plaintiffs' particular speech, which here included various forms of political

16

campaigning, would do undue harm to the morale and efficiency of his department, is by its very nature subtle and fact-specific. It requires a sheriff to guess as to whether the harm done to his department is justified by the value of the particular speech that Plaintiffs offered. In performing this "particularized balancing," it is impossible to say that Williams, without guesswork, should have known that Plaintiffs' interest in their particular efforts outweighed the harm that Williams perceived would occur in his department. Beyond this fact, *Pike's* concurring opinion also suggests that was not clearly established that Plaintiffs' positions would qualify for free speech protection in the first place. To be sure, as discussed above, the general standards for determining whether an employee's position is sufficiently elevated or visible to exempt it from First Amendment protection are indeed clearly established. *See Stott v. Haworth*, 916 F.2d 134 (4th Cir 1990) (generally exempting from First Amendment protection policymakers, communicators, and confidential privies). Although this Court, in applying those standards, has determined that Plaintiffs' jobs were not shown to be exempt from First Amendment protection, it doubts whether Williams could of known so at the time.

For both of these reasons, although Williams' alleged refusal to rehire plaintiffs based on their alleged political speech would violate a constitutional right, the Court finds that it not clearly established as a violation at the time he acted. Accordingly, Williams is entitled to qualified immunity, protecting him from legal and equitable liability in his personal capacity. At trial, Plaintiffs will be entitled only to seek equitable relief against Williams in his official capacity.

17

An appropriate Order shall issue.

ENTERED: /s/ Norman K. Moon
U.S. District Judge

April 25, 2005
Date